JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-Appellant, Jose Agosto ("Appellant"), appeals from his convictions for murder and felonious assault. For the reasons set forth below, we affirm.
 {¶ 2} On August 26, 2004, the Cuyahoga County Grand Jury indicted Appellant on three counts: one count of aggravated murder, in violation of R.C. 2903.01; one count of murder, in violation of R.C. 2903.02; and one count of felonious assault, in violation of R.C. 2903.11. Appellant pleaded not guilty to all charges.
 {¶ 3} The jury trial of this matter commenced on October 17, 2005. At trial, the State presented a number of individuals for examination. A summary of the relevant testimony follows.
 {¶ 4} Dr. Heather Nielson Raaf, Chief Deputy Coroner of Cuyahoga County, testified that she reviewed the autopsy of the victim, Joseph Gerenday, which was performed by Dr. Balraj, the elected coroner of Cuyahoga County. Dr. Balraj was unavailable during the trial of this matter.
 {¶ 5} Dr. Raaf testified that, based upon the examination of the body, the coroner determined that there were at least seven different impacts to Gerenday's head and neck. There were multiple fresh injuries to his face and head, as well as fresh injuries to his neck and shoulder. Additionally, there were defensive wounds upon his arms. An examination of the brain showed a large hemorrhage in the brain measuring six inches long and five inches wide. Additionally, Gerenday suffered from a small hemorrhage in the temporalis muscle. He also suffered from a fracture to his skull, more specifically the right orbital plate. Finally, he bled in his scalp on the left side of his head.
 {¶ 6} The report concluded that Gerenday died of a cerebral edema and anoxic encephalopathy, which is swelling and lack of oxygen to the brain, due to multiple blunt impacts to the head with comminuted fracture skull and subarachnoid hemorrhage of the brain and spinal cord. Accordingly, Dr. Raaf testified with a scientific degree of medical certainty that the manner of death was a homicide.
 {¶ 7} Finally, Dr. Raaf testified that, based on an injury to Gerenday's neck, she could determine that the injury were caused by a cylinder shaped object.
 {¶ 8} Richard Figueroa, Appellant's cousin, testified that he was with Appellant on August 12, 2004 prior to the incident. He confirmed that Appellant consumed a couple of beers prior to the incident. Figueroa, however, did not return to Appellant's home after the two drank alcohol together and was not present at the time of the incident.
 {¶ 9} Officer Dymphna O'Neill testified that she arrived at the scene of the incident when the paramedics were providing medical care to Gerenday. Further, she interviewed various people present at the scene. Namely, she interviewed Christina Leventry, who informed the officer that Appellant had beaten Gerenday with a pole. Two other individuals present during the attack confirmed Leventry's identification, as did anonymous phone calls received by the police department. Officer O'Neill further testified that a pipe was found on a tree lawn located near the scene of the crime.
 {¶ 10} Carl Miller testified that he witnessed Gerenday running to his car with his car keys in hand while Appellant was chasing him with a pole. As Gerenday attempted to open his car door, Appellant struck Gerenday in his head three times with the pole. Thereafter, Gerenday fell to the ground. After Appellant struck Gerenday, he ran into an alley nearby.
 {¶ 11} Charlie Miller, Carl's twin brother, testified that he saw the incident but was unable to identify the perpetrator.
 {¶ 12} Shannon Finnerty testified that she did not see the incident, but that she saw a man running down the street with a metal pole in his hand and heard Matt and Helen Fowler identify the man running as the Appellant. A few minutes later, Shannon Finnerty walked down the street and saw Gerenday lying on the street.
 {¶ 13} Linda Jones, an expert in fingerprint examining, testified that she was unable to extract fingerprints from the metal pole retrieved at the scene because of the rust and ridges upon the pipe.
 {¶ 14} Matt Fowler testified that saw Gerenday walking to his car with Appellant running after him. He then saw Appellant strike Gerenday three times in the head and Gerenday fall to the ground. Finally, he witnessed Appellant run up the street with a metal pole in his hand.
 {¶ 15} Helen Fowler testified that she saw Appellant after the incident carrying a pole.
 {¶ 16} Christina Leventry testified that she witnessed Gerenday bend down to unlock his vehicle door when Appellant ran out of his home towards Gerenday. Appellant struck Gerenday three times in the head with a pipe. After hitting Gerenday, Appellant ran towards Leventry.
 {¶ 17} Margaret Mary Gerenday, the victim's sister, testified that when she arrived at the hospital, her brother was on life support. As was his wish, she donated his organs.
 {¶ 18} Sara Patterson testified that she picked up Appellant from his sister's house. Upon arrival, Appellant was very intoxicated. The two drove to Patterson's home and Appellant went to sleep.
 {¶ 19} He awoke the next morning and told Patterson about the events of the previous evening. He explained that he saw a man breaking into his neighbor's home and he and his cousin, Richard Figueroa, said something to him to halt the male from crawling into the window. The male made a remark and then Appellant proceeded to fight the male. Appellant told Patterson that he hit the male twice and then attempted to kick him, but that he kicked a car door instead. He further told Patterson that his cousin Rick hit the individual with a pole. Afterwards, Appellant ran down the street.
 {¶ 20} The police arrived at Patterson's home on Sunday to arrest Appellant. Since his arrest, Appellant told Patterson that Figueroa was not present at the time of the incident.
 {¶ 21} Officer James Raynard testified that he arrived at the scene. Officer Raynard saw a vehicle at the scene, as well as the frame of eyeglasses with a lens missing, spots of blood and a broken disposable razor.
 {¶ 22} Detective James Gajowski testified that he conducted the investigation of this homicide. During an inventory of Gerenday's vehicle, the police did not find evidence of any weapon in the vehicle. After investigating Figueroa, Gajowski verified that he was not present at the scene at the time of the incident. Accordingly, Gajowski did not charge Figueroa with anything concerning this incident.
 {¶ 23} Detective Denise Kovach testified that she interviewed Appellant regarding the night of August 12, 2004. Detective Matlock was also present during the interview. After informing Appellant of his Miranda Rights, he told the detectives his version of the events of the night of August 12, 2004. Appellant also provided a written statement.
 {¶ 24} Appellant told the detectives that on August 12, 2004, he went to BW3's in the Flats and ate a large number of wings and drank a few beers. Then everyone left and he and his cousin, Figueroa, went to his house. Upon arrival at home, Appellant ate more wings.
 {¶ 25} Appellant heard Figueroa speaking to someone outside. Appellant believed the individuals were there to do drugs, which displeased Appellant. As Appellant was walking up the street, he said something to a short African-American male and then hit him. Figueroa hit the Caucasian male. Appellant either punched or hit the Caucasian male and he stumbled down from the curb to the side of the car. Appellant was not sure what he hit the Caucasian male with, but knew he picked it up from the street and dropped it when he started running down the street.
 {¶ 26} He then heard the sirens from the ambulance and fire trucks. He asked Figueroa what they should do, who told him to leave. After the incident, Appellant went to his sister's house and then his girlfriend's house.
 {¶ 27} At the conclusion of the State's case, Appellant moved for a Crim.R. 29 motion for acquittal. The trial court granted Appellant's motion as to the aggravated murder charge, but denied his motions as to the murder and felonious assault charges.
 {¶ 28} Appellant then testified on his own behalf. Appellant testified that he lied in his statement to Detective Kovach because he was scared. Namely, he lied that Figueroa was with him and that there was an African-American male present at the incident. Appellant, however, confirmed his statement that he believed Gerenday was doing drugs at his neighbor's house. Further, Appellant maintained that the two got into an altercation, at which time he picked up the pole from the garbage and chased Gerenday to his car. Appellant then struck Gerenday with the pole two or three times. Gerenday dropped to the ground and Appellant ran down the street.
 {¶ 29} After Appellant testified, the defense rested its case. The defense also made a Crim.R. 29 motion for acquittal as to the remaining two charges of felonious assault and murder, which the trial court denied.
 {¶ 30} On October 21, 2005, the jury found Appellant guilty of murder and felonious assault. The court sentenced Appellant to fifteen years to life in prison, merged count three, and ordered that the sentence be served consecutively to CR 422860 and CR 442256, two cases in which Appellant was found to be a community control sanctions violator.
 {¶ 31} Appellant now appeals his convictions and submits three assignments of error for our review.
 {¶ 32} Appellant's first assignment of error states:
 {¶ 33} "The trial court erred in denying Appellant's motion for acquittal as to the charges when the State failed to present sufficient evidence to sustain a conviction."
 {¶ 34} Crim.R. 29(A) governs motions for acquittal and provides for a judgment of acquittal if the evidence is insufficient to sustain a conviction. Pursuant to Crim.R. 29, a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. A Crim.R. 29(A) motion for acquittal "should be granted only where reasonable minds could not fail to find reasonable doubt." State v. Apanovitch (1987),33 Ohio St.3d 19, 23, 514 N.E.2d 394; State v. Jordan, Cuyahoga App. Nos. 79469 and 79470, 2002-Ohio-590.
 {¶ 35} The standard for a Rule 29 motion is virtually identical to that employed in testing the sufficiency of the evidence. State v. Turner, Franklin App. No. 04AP-364,2004-Ohio-6609, citing State v. Thompkins, 78 Ohio St.3d 380,386, 1997-Ohio-52, 678 N.E.2d 541. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Thompkins,
supra.
 {¶ 36} Within this assignment of error, Appellant maintains that he did not purposely cause Gerenday's death or knowingly commit a felonious assault. The evidence introduced at the trial of this matter sufficiently establishes the contrary. Numerous witnesses testified, and Appellant confirmed, that he chased after Gerenday with a pole and struck him at least three times in the head with that pole. Then Appellant left Gerenday lying on the street and fled the scene.
 {¶ 37} The blows to Gerenday's head were so fierce that he suffered a fractured skull, a large hemorrhage in the brain measuring six inches long and five inches wide, a small hemorrhage in the temporalis muscle, and bleeding in the scalp to the left side of his head. As a proximate cause of these injuries, Gerenday died the following day.
 {¶ 38} At the time of the assault, Gerenday had no weapons. Instead, he was carrying a set of keys, attempting to open his car door in an effort to flee Appellant's attacks.
 {¶ 39} In light of this evidence, we can only conclude that Appellant should have known that his attack upon Gerenday with a pole would have probably resulted in serious physical injury to Gerenday. Accordingly, we conclude that there was sufficient evidence establishing that Appellant committed a felonious assault, with the murder of the victim being a proximate cause therefrom. Appellant's first assignment of error is without merit.
 {¶ 40} Appellant's second assignment of error states:
 {¶ 41} "Appellant's convictions are against the manifest weight of the evidence."
 {¶ 42} In State v. Thompkins, 78 Ohio St.3d 380, 388,1997-Ohio-52, 678 N.E.2d 541, the court illuminated its test for manifest weight of the evidence as follows:
 {¶ 43} "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' Black's [Law Dictionary (6 Ed. 1990)], at 1594."
 {¶ 44} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Id., citing Tibbs v. Florida (1982), 457 U.S. 31,45, 102 S.Ct. 2211, 72 L.Ed.2d 652. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the court clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. See Statev. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
 {¶ 45} The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id.
 {¶ 46} In this matter we cannot conclude that the jury lost its way. As previously stated, numerous individuals witnessed Appellant forcefully strike Gerenday on the head with a pole a number of times and then run from the scene. Gerenday did not possess any weapons, but instead, was attempting to flee Appellant's attack. As a result of the attack, Gerenday suffered considerable injuries, which resulted in his death. Weighing all the evidence and all reasonable inferences, we find that the trial court could reasonably conclude that Appellant committed a felonious assault upon the victim and he died as a result of that attack. Accordingly, Appellant's second assignment of error is without merit.
 {¶ 47} Appellant's third assignment of error states:
 {¶ 48} "The trial court erred by refusing to instruct the jury on the lesser included offense of reckless homicide which denied Appellant's right to a fair trial."
 {¶ 49} Appellant asserts that the trial court should have instructed the jury on the lesser included offense of reckless homicide, R.C. 2903.041. This court has previously held that reckless homicide under R.C. 2903.041 is a lesser included offense of murder, in violation of R.C. 2903.02. State v.Jones, Cuyahoga App. No. 80737, 2002-Ohio-6045. However, even though an offense may be statutorily defined as a lesser included offense of another, a charge on the lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense. State v. Thomas
(1988), 40 Ohio St.3d 213, 216, 533 N.E.2d 286, certiorari denied (1989), 493 U.S. 826, 110 S.Ct. 89, 107 L.Ed.2d 54; State v.Kidder (1987), 32 Ohio St.3d 279, 513 N.E.2d 311.
 {¶ 50} In the instant matter, we do not find that the jury could have reasonably acquitted Appellant of murder while finding him guilty of reckless homicide, in light of the magnitude of the force which Appellant applied to Gerenday. Appellant struck Gerenday with a metal pole with such force that he suffered a fractured skull, a large hemorrhage in the brain measuring six inches long and five inches wide, a small hemorrhage in the temporalis muscle, and bleeding in the scalp of the left side of his head. The injuries to Gerenday were due to very significant forces and were so extreme that Appellant should have known that they would have probably resulted in the death of Gerenday. Reasonable minds, therefore, could find that Appellant's actions were purposeful and not merely reckless. Accordingly, an instruction on reckless homicide was not warranted. Appellant's third assignment of error is without merit.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence. A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Calabrese, Jr., J., and Corrigan, J., concur